In the Matter of the Application for DIS-CIPLINARY ACTION AGAINST John F. LaQUA, a Member of the Bar of the State of North Dakota.

DISCIPLINARY BOARD OF the SU-PREME COURT OF the STATE OF NORTH DAKOTA, Petitioner,

v.

John F. LaQUA, Respondent.

Civ. No. 950406.

Supreme Court of North Dakota.

May 14, 1996.

acts of professional misconduct in connection with the probate of an estate and recommended he be suspended for six months and placed on probation for an additional two months following the suspension. The Board considered the matter, accepted the findings and recommendation of the hearing panel, and under Rule 3.1(F) of the North Dakota Procedural Rules for Lawyer Disability and Discipline (NDPRLDD),[1] submitted its report and recommendation of suspension for consideration by this court. LaQua filed objections to the Board's report and filed a brief with and presented oral argument before this court. We direct that LaQua be suspended from the practice of law for six months, followed by two months of probation with conditions, and that he pay the costs associated with these proceedings.

■ We review disciplinary proceedings against attorneys de novo on the record under a clear and convincing standard of proof. *Disciplinary Action Against Rau*, 533 N.W.2d 691, 692 (N.D.1995). In our review, we accord due weight to the findings, conclusions, and recommendation of the hearing panel as adopted by the Board. *Matter of Dosch*, 527 N.W.2d 270, 272 (N.D.1995). While we attempt to impose similar disciplinary measures for similar violations under similar circumstances, each case must be judged on its own facts and merits. *Matter of Maragos*, 285 N.W.2d 541, 546 (N.D.1979).

I

LaQua was admitted to practice as an attorney in North Dakota on October 10, 1951, and opened his practice in Langdon. In 1967, LaQua prepared a joint and mutual will for William and Anna Sheppler, a married couple, providing the property of each would pass to the survivor. The will further provided that after the survivor's death, the property would be converted to cash and several specific bequests made, with the residue of the estate to pass to the Diocese of Fargo, a Roman Catholic religious corporation located in Fargo. The will named LaQua as co-executor.

Paul W. Jacobson, Assistant Disciplinary Counsel (argued), Bismarck, for petitioner.

Thomas L. Zimney (argued), of Vaaler, Warcup, Woutat, Zimney & Foster, Grand Forks, for respondent.

PER CURIAM.

A hearing panel of the Disciplinary Board found attorney John F. LaQua committed

---

1. Because this matter was pending when the North Dakota Rules for Lawyer Discipline (NDRLD) became effective on January 1, 1995, the NDPRLDD apply. *See* NDRLD 6.6.

The Shepplers died within a short time of each other and LaQua began acting as co-executor of their estate in 1975. The other co-executor died a few years later. LaQua completed distribution of the specific bequests provided in the will within a reasonable time after his appointment. However, until his resignation as personal representative in 1994, LaQua essentially did nothing with the estate and did not distribute the residue of estate assets to the Diocese.

At the time of the last Sheppler's death, the value of the residue of the estate was approximately $227,000. During the ensuing years, the estate assets remained in accounts and investments originated by the Shepplers, consisting primarily of certificates of deposit, United States government bonds, noninterest bearing bank accounts, and J.C. Penney stock. From 1980 through 1986, LaQua did not deposit interest and dividend checks received from those investments, but instead placed them in a desk drawer. Most of the stale checks have since been reissued. LaQua also did not always file timely or appropriate fiduciary income tax returns and had to pay income tax, interest, and penalties on behalf of the estate. Although amended fiduciary tax returns have been filed and some tax, interest, and penalties have been recovered, questions remain concerning tax years before 1991. LaQua notified the Diocese in 1975 it was a named residual beneficiary in the will, but did not inform it that funds were held for its benefit or provide it with an accounting.

When asked why he did not distribute the residual estate assets to the Diocese, LaQua testified he had a mental blank or block and was unable to close the estate:

> "If I could tell you that, gentlemen, I would. I don't know. Call it neglect, call it procrastination, but every time I picked that file up, my mind just became a mental blank. Like a bad dream and you hoped it would go away."

LaQua neither received a fee from the estate nor converted the assets for his personal use. The Board found no evidence that LaQua engaged in conduct involving dishonesty, fraud, deceit or misrepresentation. The Board noted LaQua had cooperated fully in the disciplinary process, had no prior disciplinary record, and is remorseful over his handling of the estate.

The value of estate assets when they were turned over to the successor personal representative in 1994 was approximately $295,000. According to the comptroller for the Diocese, the assets could have generated earnings of between $674,000 and $2,336,000 during the 19 years they essentially sat idle. Civil litigation between the Diocese and LaQua resulted in a settlement from LaQua's malpractice insurer. The settlement amount is not a part of this record.

■ The Board found LaQua's 19 years of neglect of the estate constituted conduct that violated Rules 1.3 (Diligence), 1.4(a) (Communication), and 1.15(b) (Safekeeping Property), of the North Dakota Rules of Professional Conduct (NDRPC), and before January 1, 1988, Disciplinary Rules (DR) 1–102(A)(1) (Misconduct), 6–101(A)(3) (Failing to Act Competently), 7–101(A)(2) (Representing a Client Zealously), and 9–102(B) (Preserving Identity of Funds and Property of a Client), of the North Dakota Code of Professional Responsibility (NDCPR). LaQua does not challenge the Board's finding that he violated these provisions through his handling of the Sheppler estate. We conclude there is clear and convincing evidence that LaQua's failure to make a timely distribution of the residue of the estate to the Diocese and failure to close the estate for 19 years violated these provisions of the Rules of Professional Conduct and Code of Professional Responsibility.

II

■ LaQua does challenge, on several grounds, the Board's recommendation of the sanction to be applied for his violation of the disciplinary rules. The theoretical framework for imposing sanctions against lawyers who are guilty of professional misconduct directs that we consider: (1) the ethical duty violated by the lawyer; (2) the lawyer's mental state; (3) the extent of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of aggravating or mitigating factors. *Disciplinary Board v.*

*Gray,* 544 N.W.2d 168, 171 (N.D.1996); Standard 3 of the North Dakota Standards for Imposing Lawyer Sanctions (NDSILS). In its recommendation, the Board referred to NDSILS 4.12, which provides "[s]uspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client." The Board also referred to NDSILS 4.41(b), which provides "[d]isbarment is generally appropriate when . . . a lawyer knowingly fails to perform services for a client and causes serious or potentially serious injury to a client; . . ." The Board found LaQua's actions caused serious injury to the Diocese by depriving it for 19 years of the use and benefit of the sums left to it under the terms of the Sheppler will.

The Board found, as mitigating factors under NDSILS 9.1 and 9.32, LaQua's absence of a prior disciplinary record, the absence of a dishonest or selfish motive, his cooperative attitude, his reputation, and his remorse. The only aggravating factor found by the Board was LaQua's substantial experience in the practice of law. The Board recommended a six month suspension followed by two months of probation during which LaQua's files must be audited to insure they are current and no client is at risk of injury from lack of diligence. The Board also recommended that, because of LaQua's testimony about "mental blocks," during the probation period LaQua must receive a medical evaluation certifying he is not under a disability that would prevent him from practicing law.

LaQua asserts the Board's sanction of a six month suspension followed by two months probation is excessive. He urges a public reprimand is the maximum sanction that should be imposed under the circumstances.

### A

LaQua asserts suspension is a disproportionate sanction when compared to other cases arising under similar circumstances. He relies on numerous decisions from North Dakota and other jurisdictions for the proposition that courts in similar circumstances have imposed no more than a public repri-

mand for neglecting to complete the probate of an estate.

The cases relied on by LaQua are not particularly helpful. The factual circumstances in each of the cases vary, and are distinguishable from LaQua's situation. The only unifying theme in them is that the courts approved recommendations of public reprimands for an attorney's delay in resolving probate matters. *Disciplinary Action Against Sletten,* 536 N.W.2d 354 (N.D.1995), involved an attorney's failure to timely file a petition for an elective share of an estate, resulting in substantial financial injury to the client, but there is no indication of the amount of time or injury involved. Although *Disciplinary Board v. Amundson,* 297 N.W.2d 433 (N.D.1980), involved an attorney who failed to take any significant action toward closing an estate and claimed a "mental block" prevented him from doing so, the length of his inaction on the estate was approximately four years.

Because the other cases relied on by LaQua are from other jurisdictions and are also factually distinguishable, we feel no compulsion to follow them. In *Disciplinary Action Against MacGibbon,* 535 N.W.2d 809 (Minn. 1995), the failure of the attorney to close the estate for more than 30 years resulted in a significant increase in the value of the estate and none of the heirs complained about the attorney's administration of the estate. *Disciplinary Proceedings Against Woboril,* 128 Wis.2d 400, 382 N.W.2d 436 (1986), involved an attorney who neglected an estate and testamentary trust for 13 years, but much of the delay was attributable to disputes with the life beneficiary of the trust. *Disciplinary Proceedings Against Leadholm,* 151 Wis.2d 561, 445 N.W.2d 41 (1989), and *Disciplinary Proceedings Against Finnegan,* 120 Wis.2d 195, 353 N.W.2d 362 (1984), involved attorneys who had neglected closing estates for about five years.

In *Kentucky Bar Association v. Smith,* 883 S.W.2d 880 (Ky.1994), where the attorney neglected estate matters for 12 years, the court was careful to point out that the attorney had "reimbursed the estate for financial losses and penalties paid as a result of her failure to file timely estate tax re-

turns." In *Carter v. Flynn*, 462 A.2d 976 (R.I.1983), the attorney did not file an account with the probate court for a period of 15 years, but it appears the attorney did some work on the estate during that time. In *Committee on Legal Ethics v. Matthews*, 186 W.Va. 122, 411 S.E.2d 265 (1991), the attorney failed to settle an estate during a four year period.

Conversely, several courts have approved suspensions for an attorney's delay and mishandling of the probate of an estate in various cases which, like the cases relied on by LaQua, are not on all fours with the circumstances before us. *See, e.g., Butler v. State Bar of California*, 42 Cal.3d 323, 228 Cal. Rptr. 499, 721 P.2d 585 (1986) (two year suspension stayed upon conditions including 60 days actual suspension where attorney delayed probating estate for at least four years and had previously been given a private reproval for not probating an estate for five years); *The Florida Bar v. Richardson*, 242 So.2d 706 (Fla.1971) (12 month suspension for attorney who delayed probating estate for almost five years and paid legal and executor's fees without court order); *Com. on Professional Ethics & Conduct v. Rogers*, 313 N.W.2d 535 (Iowa 1981) (indefinite suspension with no possibility of reinstatement for four months where attorney opened three estates and two conservatorships but did nothing else on them for more than five years); *Kentucky Bar Ass'n v. Richards*, 796 S.W.2d 363 (Ky.1990) (one year suspension for attorney's 13 year delay in closing estate); and *State v. Conley*, 219 Neb. 617, 365 N.W.2d 434 (1985) (six month suspension for attorney who did not complete probate in three year period where attorney had previously been publicly reprimanded for issuing insufficient fund check from trust account, even though his probate inaction caused no financial loss to client).

The decisional law thus demonstrates the broad range of disciplinary sanctions courts have applied when an attorney has delayed probating an estate. We tailor the disciplinary sanction to the specific facts and circumstances in this case. *See Matter of Jones*, 487 N.W.2d 599, 601 (N.D.1992).

B

■ LaQua asserts there is no clear and convincing evidence that he "knowingly" committed the misconduct. We disagree.

Knowledge is defined as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." NDSILS Definitions. *See also* NDRPC Terminology (" 'Knowingly', 'known', or 'knows' denotes actual knowledge of the fact in question. A person's knowledge may be inferred from the person's conduct in the circumstances.").

■ LaQua asserts the "mental block" or "mental blank" he had with regard to the Sheppler estate shows he did not knowingly act or fail to act on the estate. A knowing or willful act for purposes of a professional disciplinary proceeding does not require evil intent or bad purpose; rather, the terms mean the act was done in the exercise of the performer's free will and was not done under coercion. *See Matter of Disciplinary Action Against Larson*, 512 N.W.2d 454, 457 (N.D. 1994). LaQua did not make the distribution to the residual beneficiary for 19 years. He testified that every time he picked up the file, his "mind just became a mental blank." He received interest and dividend payments which he did not cash, but placed in a desk drawer. Yet, in 1990 he filed the estate's income tax returns for the prior years. This evidence clearly and convincingly establishes that LaQua knew the estate had to be completed and the property distributed to the residual beneficiary. He simply did not do so. The lack of any dishonest intention does not mean LaQua was unaware of the nature and attendant circumstances of his conduct. While personal or emotional problems and mental disabilities are mitigating factors that may reduce a disciplinary sanction against an attorney, they do not justify or excuse the attorney's misconduct. *Rau*, 533 N.W.2d at 694.

C

■ LaQua asserts there is no clear and convincing evidence that he seriously injured the Diocese. LaQua argues any loss suf-

fered by the Diocese was resolved by its settlement with his malpractice insurer. La-Qua relies on a letter written to his attorney from the attorney for the Diocese stating, "[t]he claims have been fully resolved by agreement with the carriers and the Diocese has been compensated, we believe, to the fullest extent possible. . . . [T]he IRS and the state of North Dakota have both made significant refunds on the Amended Estate and Fiduciary Income Tax returns."

■ Although disbarment is appropriate when an attorney engages in conduct which causes serious or potentially serious injury to a client, suspension is appropriate when the conduct causes injury or potential injury to the client which is not denominated as "serious" injury. *Matter of Ellis,* 439 N.W.2d 808, 810 (N.D.1989). Injury is defined as "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from 'serious' injury to 'little or no' injury; a reference to 'injury' alone indicates any level of injury greater than 'little or no' injury." NDSILS Definitions. Although the Board need not have found "serious" injury to recommend a suspension, we conclude there is clear and convincing evidence that LaQua's conduct did cause serious injury to the Diocese.

■ That an injured party may recover from a lawyer in a malpractice action is not in itself sufficient to show that a client suffered no injury or that disciplinary proceedings are no longer necessary. *Matter of Jaynes,* 267 N.W.2d 782, 784 (N.D.1978). Indeed, forced or compelled restitution is neither an aggravating nor mitigating factor. NDSILS 9.4(a). Moreover, there is no evidence in the record of the amount of the settlement in this case. The statement from the attorney for the Diocese that the Diocese has been compensated "to the fullest extent possible" falls short of suggesting that a full satisfaction for the loss has occurred. The estate assets essentially sat idle for 19 years while interest and dividend checks remained uncashed. These years spanned a period of high interest rates obtainable from relatively safe investments. The comptroller for the Diocese estimated the loss at between $674,-000 and $2,336,000. The injury to the Diocese was clearly "serious."

### III

■ We adopt the sanction recommended by the Board. LaQua's knowing lack of diligence and failure to safekeep the Sheppler estate for 19 years is grave misconduct. LaQua's misconduct caused serious harm to the Diocese. A finding of serious harm to a client ordinarily warrants disbarment. *See Ellis,* 439 N.W.2d at 810. The mitigating factors in this case, however, support the lesser sanction of suspension.

The Commentary to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (February 1986), at p. 38, which served as the basis for our standards, *see Gray,* 544 N.W.2d at 171, states that "[s]uspension is appropriate when the lawyer is not intentionally using the professional relationship to benefit himself or another, but nevertheless knowingly breaches a client's confidence such that the client suffers injury or potential injury." Here, LaQua's actions were not motivated by dishonesty or selfishness. He did not receive a fee from the estate and did not divert its assets for his personal use. He cooperated fully in the disciplinary process and is remorseful over the handling of the estate. LaQua has no prior disciplinary record. Indeed, what makes the handling of the Sheppler estate so bizarre and uncharacteristic is LaQua's lengthy, substantial, and reputable experience in the practice of law.

LaQua submitted a letter from a physician who opined LaQua "will suffer no further mental blanks or mental blocks as he described to me as occurred in his handling of the Sheppler Estates since the psychological stress due to illness and death of family members that happened in that time frame are now over and are not expected to recur." Personal problems do not justify an attorney's failure to attend to matters entrusted to the attorney. *Matter of Larson,* 450 N.W.2d 771, 774 (N.D.1990). This principle applies with particular force here, where the mental blocks occasioned by the stress of personal problems spanned 19 years, and

apparently had no effect on other legal matters entrusted to LaQua.

Considering the appropriate factors and all mitigating circumstances, we order that LaQua be suspended from the practice of law for six months and that he serve a two month probationary period after completion of the suspension. During the suspension and probationary period, LaQua's files must be audited to insure they are current and that no client is at risk of injury from lack of diligence. LaQua must also receive during the suspension and probationary period another medical evaluation certifying he is not under a disability that would prevent him from practicing law. LaQua is also ordered to pay the costs and expenses of this disciplinary proceeding.

VANDE WALLE, C.J., and NEUMANN, SANDSTROM and MESCHKE, JJ., concur.

The Honorable Mary Muehlen Maring was not a member of the Court when this case was heard and did not participate in this decision.